IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Civil Action No. 1:25-cv-282

| | |
|---|---|
| RYAN LAQUATRA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| WAYNESVILLE AUTOMOTIVE GROUP, ) | |
| LLC, d/b/a AUTOSTAR CHEVROLET OF ) | **COMPLAINT** |
| WAYNESVILLE and AUTOSTAR ) | |
| CHRYSLER DODGE JEEP RAM FIAT OF ) | |
| WAYNESVILLE, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

Plaintiff brings this action against the Defendant for compensatory damages and punitive damages, pursuant to the Title I of Americans with Disabilities Act of 1990, as amended (the "ADAAA"), Title I of the Civil Rights Act of 1991, and the common law of the State of North Carolina for wrongful discharge in violation of public policy. Plaintiff alleges that the Defendant unlawfully discriminated against him because of his mental health disability following a traumatic event and retaliated against him because he engaged in a protected activity.

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337, 1343 and 1367.

2. Venue is properly set in the Western District of North Carolina pursuant to 28 U.S.C. § 1391, as the corporate Defendant's principal office and place of business is situated in this district and the causes of action alleged herein arise from events occurring in this district.

3. Plaintiff's federal claims are authorized and instituted pursuant to Section 107(a) of the ADAAA, 42 U.S.C. § 12117(a), which incorporates by reference Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5(f)(1) and (3), and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

4. Plaintiff's state-law claim of wrongful discharge is authorized because it is so related to his federal statutory claims as to form part of the same case or controversy under Article III of the United States Constitution.

## PARTIES

5. Plaintiff Ryan Jeffrey LaQuatra is a citizen and resident of Haywood County, North Carolina.

6. Defendant Waynesville Automotive Group, LLC ("Defendant"), does business as Autostar Chevrolet of Waynesville ("Autostar Chevrolet") and as Autostar Chrysler Dodge Jeep Ram Fiat of Waynesville ("Autostar CDJR"), and is a limited liability company with its principal places of business in Buncombe County and Haywood County, North Carolina.

7. At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce under Section 101(5) of the ADAAA, 42 U.S.C. § 12111(5), and Section 101(7) of the ADAAA, 42 U.S.C. § 12111(7), which incorporate by reference Sections 701(g) and (h) of Title VII, 42 U.S.C. §§ 2000e(g) and (h).

8. At all relevant times, Defendant has been a covered entity within the meaning of Section 101(2) of the ADAAA, 42 U.S.C. § 12111(2).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. More than thirty days prior to the institution of this lawsuit, Plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title I of the ADAAA by Defendant.

10. On June 3, 2025, the District Director for the Charlotte District Office of the EEOC issued a "Determination and Notice of Rights" to the Plaintiff, a copy of which is attached hereto as <u>Exhibit A</u> and incorporated herein by reference.

11. Plaintiff's Complaint was filed within 90 days of his receipt of the attached "Determination and Notice of Rights" from the EEOC.

12. All conditions precedent to the institution of this Complaint by the Plaintiff have been fulfilled.

## FACTUAL ALLEGATIONS

13. On December 1, 2024, Defendant hired Plaintiff to work as a Parts Consultant on a full-time basis in the Parts Department of its automobile dealership.

14. Prior to coming to work for the Defendant, Plaintiff worked in Asheville as a mechanic for Troop G of the North Carolina State Highway Patrol.

15. At all relevant times, Plaintiff was qualified to perform the essential functions of his position and performed his duties that met Defendant's expectations.

16. In the early morning hours of Sunday, March 16, 2025, Plaintiff witnessed a shooting in a residence on Mary John Drive in Waynesville that resulted in the death of an individual named Chris Monteath, who was a friend of the Plaintiff.

17. Plaintiff called 9-1-1 in Haywood County to report the shooting and to seek emergency medical services for his friend.

18. Later that day, at about 2:50 p.m., Plaintiff sent a text message to his supervisor in the Autostar Chevrolet Parts Department, Jeffery Harris (hereinafter, "Harris"), stating: "Afternoon, I'm not gonna be able to come in for the next few days. I've just gone threw (sic) some horrible trauma and not dealing with it mentally good (sic). Just happend (sic) this morning.

3

Case 1:25-cv-00282    Document 1    Filed 08/26/25    Page 3 of 15

Yeah I know we joke at work about stupid shit but I'd appreciate it if this was kept quiet. I've told Chris already. Sorry for the short notice but my life has changed dramatically."

19. Attached hereto and marked <u>Exhibit B</u> is a true and correct copy of Plaintiff's text message to Harris on Sunday, March 16, 2025.

20. Harris responded: "We will talk when you come back to work," to which the Plaintiff responded: "Thanks".

21. Attached hereto and marked <u>Exhibit C</u> is a true and correct copy of Harris' reply to Plaintiff's text message.

22. Two days later, on Tuesday, March 18, 2025, Plaintiff went to the Autostar Chevrolet Parts Department to meet with Harris to discuss his return to work.

23. While he was there, Plaintiff took his car to the Autostar Chevrolet Service Department to obtain a state inspection, as the deadline for his annual vehicle registration was coming up soon.

24. During that meeting, Harris questioned the Plaintiff about his need for time off of work, stating: "So you can come get your inspection done, but you can't come to work?"

25. Harris stated that his daughter had been killed by a drunk driver five years ago and that what the Plaintiff was dealing with was not significant in comparison.

26. Plaintiff was upset by Harris' comments and walked out of the meeting, at which point Harris threatened to terminate Plaintiff's employment.

27. The Plaintiff then contacted his mother, Michele Noel-LaQuatra, who has decades of experience working in human resources for: the North Carolina Department of Transportation (8 years); a North Royalton City School District in the State of Ohio (13 years); and Hillsborough County School District in the State of Florida (8 years).

28. Plaintiff's mother came to the dealership and confronted Harris about his inappropriate reaction to Plaintiff's mental health disability and requested accommodation.

29. Harris told Plaintiff's mother the same thing he had told the Plaintiff – that the Plaintiff's witnessing his friend being killed was not as traumatic as his daughter's death.

30. Plaintiff's mother told Harris that the Plaintiff would be out of work the rest of the week, that he would come back to work on the following Monday, and that there better not be any retaliation after he came back to work.

31. Plaintiff's mother then called the Defendant's Human Resources office and spoke with Jesse Bryant ("Bryant"), Defendant's Human Resources Manager.

32. Plaintiff's mother told Bryant that Harris had been dismissive of Plaintiff's disability and had threatened to fire him.

33. Bryant told Plaintiff's mother that she was sorry for what had happened when the Plaintiff met with Harris and mentioned that the Defendant had an Employee Assistance Program (EAP) policy.

34. An EAP policy is a voluntary, work-based program that offers free and confidential assessments, short-term counseling, referrals, and follow-up services to employees who have personal and/or work-related problems, including traumatic events.

35. On Monday, March 24, 2024, Plaintiff returned to work in the Parts Department at 7:45 a.m.

36. Throughout the day, Harris acted in a hostile manner towards the Plaintiff by, among other things, nit-picking his work, questioning whether the Plaintiff wanted to continue working there, sweeping the floor an hour earlier than Plaintiff usually did that task each day, sweeping dramatically around Plaintiff's chair while he was sitting in it, throwing trash cans around, and accusing the Plaintiff of not doing his job.

5

37. The Plaintiff sent an email to Amy Edwards ("Edwards"), Defendant's General Manager, reporting that he needed to have a meeting with her as soon as possible regarding his supervisor, Jeffrey Harris. Edwards had been Defendant's General Manager for about three weeks at that point.

38. After the end of his shift at 5:00 p.m., Plaintiff went over to the Chrysler/Dodge side of the dealership to meet with Edwards, which was where her office was located.

39. When Plaintiff arrived to Edwards' office, two of Defendant's managers were in Edwards' office with her – Dale Hollifield and Heath Payne.

40. Dale Hollifield ("Hollifield") is the Used Sales Manager for Autostar CDJR, and Heath Payne ("Payne") is the Sales Manager for Autostar Chevrolet.

41. Plaintiff asked to be able to speak with Edwards alone and she initially said "No," but then Payne left the room and Hollifield remained.

42. Plaintiff then reported to Edwards that Harris had been dismissive of Plaintiff's request for time off when he had met with him the previous week, that Harris had threatened to terminate Plaintiff's employment, and that Harris had been hostile towards Plaintiff throughout the day after he came back to work, including nit-picking his work, questioning whether he wanted to continue working there, sweeping the floor an hour earlier than Plaintiff usually did that task each day, sweeping dramatically around Plaintiff's chair while he was sitting in it, throwing trash cans around, and accusing the Plaintiff of not doing his job.

43. Edwards listened to what Plaintiff had to report about Harris' behavior and said that she would look into it and meet with the Plaintiff and Harris the next morning at 8:00 a.m.

44. Plaintiff then left work and picked up his friend, Jonathan Roberts ("Roberts"), and they went to eat dinner at Church Street Depot, which is approximately 100 feet away from the Waynesville Police Department in downtown Waynesville.

45. Roberts had also been at the residence on Mary John Drive in Waynesville on March 16th and had also witnessed the shooting death of Chris Monteath, who was a friend of both of theirs.

46. After eating dinner, the Plaintiff dropped Roberts off at his house, which is near Maggie's Galley Seafood Restaurant in Waynesville, and then drove to 165 Oak Park Drive, in Clyde, North Carolina, where the Plaintiff lives with his girlfriend.

47. The next morning, on Tuesday, March 25, 2025, Plaintiff arrived to work before his workshift began at 8:00 a.m.

48. Plaintiff saw that he had received an e-mail from Edwards saying that she was overbooked and that she would be able to meet with the Plaintiff later that day.

49. After the lunch hour, at about 1:00 p.m., Joy Haney ("Haney"), an Autostar Chevrolet employee, came to the Parts Department and told the Plaintiff that Edwards was ready to meet with him.

50. Plaintiff then walked over with Haney to Edwards' office at the Chrysler/Dodge side of the dealership.

51. In the showroom, before he got to Edwards' office, Plaintiff was greeted by Tyler Howell, a police officer from the Waynesville Police Department ("Officer Howell").

52. Officer Howell then proceeded to search the Plaintiff for weapons in front of other employees and customers in the Autostar CDJR showroom, which was embarrassing and humiliating to the Plaintiff.

53. Plaintiff then went into Edwards' office and, in addition to Edwards and Officer Howell, all, or nearly all, of Defendant's managers other than the owner were there:

    a. Dale Hollifield, Used Sales Manager for Autostar CDJR;

    b. Health Payne, Sales Manager for Autostar Chevrolet;

7

c. Robert Austin, Fixed Operations Manager for Autostar CDJR;

d. Ron Russell, Finance Manager for Autostar Chevrolet; and

e. Chris Waters, Service Manager for Manager for Autostar CDJR.

54. Edwards then told the Plaintiff that she had heard that he had been damaging another employee's property and that she had received a "video" of the Plaintiff throwing rocks at Harris's house.

55. Plaintiff said that was not true and that he had not been anywhere near Harris' house after work the day before, which is on Moody Farm Road on the way to Maggie Valley.

56. Plaintiff asked to see the video, which Edwards did not show him and said, "No, we're not going to talk about it."

57. Edwards did not ask any questions of the Plaintiff and told the Plaintiff that his employment was terminated and that he was to leave the Defendant's property and that if he ever came back on the property he would be arrested for trespassing.

58. Plaintiff was then escorted to his vehicle by Officer Howell and left the Defendant's property.

59. Later that day, Plaintiff went to the Waynesville Police Department to find out if any criminal charge had been brought against him by Harris and to find out what the basis was of any charge that had been brought.

60. At the Waynesville Police Department, the Plaintiff met with Officer Howell, who told him that they did not bring criminal charges for trivial matters like that.

61. Plaintiff asked Officer Howell when it was that he supposedly threw rocks at Harris' house because he did not go anywhere near Harris' house after work on Monday.

62. Officer Howell told the Plaintiff that "based on his 48-hour memory" it happened on "Sunday."

8

63. Plaintiff did not go anywhere near Harris's house on Sunday, March 23, 2025, and, throughout the entire day that they worked together on Monday, March 24, 2025, Harris did not mention anything to the Plaintiff about having a video of the Plaintiff throwing rocks at his house.

64. Plaintiff also learned from Officer Howell that Harris had communicated with him about the Plaintiff by calling Officer Howell's personal cell phone and that they knew each other.

65. Upon information and belief, Harris manufactured "evidence" that he provided to Officer Howell to support his false accusation that the Plaintiff threw rocks at his house, and he did this:

    a. because of his discrimination against the Plaintiff for having a mental health disability following a traumatic event;

    b. in retaliation for Plaintiff's taking leave from work due to his mental health disability;

    c. in retaliation for the Plaintiff's mother confronting him and complaining to Jesse Bryant about Harris's harassment and threat to terminate the Plaintiff's employment on March 18, 2025; and

    d. in retaliation for the Plaintiff complaining to Amy Edwards about Harris's hostile behavior towards him on his return to work on Monday, March 24, 2025.

66. Harris was at all times acting within the course and scope of his employment by the Defendant when he falsely accused the Plaintiff of throwing rocks at his house.

67. Defendant condoned Harris' discriminatory and retaliatory conduct towards the Plaintiff by failing to reasonably investigate Harris' false accusation against the Plaintiff and immediately terminating Plaintiff's employment.

## FIRST CAUSE OF ACTION
**Unlawful Employment Discrimination**

68. Plaintiff re-alleges and incorporates by reference each and all of the allegations stated in Paragraphs 1 through 67 of this Complaint as if fully set forth herein.

69. Plaintiff was a person with a mental health disability, believed to be post-traumatic stress disorder, following a traumatic event because his disability "substantially limit[ed] one or more major life activities" as those terms are defined under the ADAAA and related federal regulations.

70. The ADAAA lists "concentrating, [and] thinking" as examples of major life activities and "brain . . . function[]" as a "major bodily function." 42 U.S.C. § 12102(2)(A) and § 12102(2)(B).

71. The ADAAA provides: "The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." 42 U.S.C. § 12102(4)(A).

72. 29 C.F.R. § 1630.2(j)(3)(iii) provides: "[A]pplying the principles set forth in paragraphs (j)(1)(i) through (ix) of this section, it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia substantially limit brain function."

73. Plaintiff had the ability to perform the essential functions of his employment position as a Parts Consultant with or without a reasonable accommodation.

74. Plaintiff suffered adverse employment action because of his disability on Tuesday, March 18, 2025 and on Monday, March 24, 2025, in the form of hostility against him by Harris, which affected the conditions of Plaintiff's workplace.

75. Plaintiff suffered adverse employment action because of his disability on Tuesday, March 25, 2025, when his employment was terminated by the Defendant based on a false accusation made against him by Harris, which the Defendant condoned by, among other things, failing to reasonably investigate.

76. The effect of these practices, Plaintiff was deprived of equal employment opportunities and his employment status was adversely affected because of his disability.

77. The unlawful employment practices complained of above were intentional and were done with malice or with reckless indifference to Plaintiff's federally protected rights.

## SECOND CAUSE OF ACTION
### Unlawful Retaliation

78. Plaintiff re-alleges and incorporates by reference each and all of the allegations stated in Paragraphs 1 through 77 of this Complaint as if fully set forth herein.

79. Plaintiff was a person with a mental health disability, believed to be post-traumatic stress disorder, following a traumatic event because his disability "substantially limit[ed] one or more major life activities" as those terms are defined under the ADAAA and related federal regulations.

80. The ADAAA lists "concentrating, [and] thinking" as examples of major life activities and "brain . . . function[]" as a "major bodily function." 42 U.S.C. § 12102(2)(A) and § 12102(2)(B).

81. The ADAAA provides: "The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." 42 U.S.C. § 12102(4)(A).

82. 29 C.F.R. § 1630.2(j)(3)(iii) provides: "[A]pplying the principles set forth in paragraphs (j)(1)(i) through (ix) of this section, it should easily be concluded that the following

types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia substantially limit brain function."

83. Plaintiff had the ability to perform the essential functions of his employment position as a Parts Consultant with or without a reasonable accommodation.

84. After requesting a reasonable accommodation for his disability, Plaintiff suffered retaliation because of his request for an accommodation on Tuesday, March 18, 2025, in the form of hostility against him by Harris, which affected the conditions of Plaintiff's workplace.

85. After taking time off of work due to his disability, Plaintiff suffered retaliation on Monday, March 24, 2025 because of his taking time off of work in the form of hostility against him by Harris, which affected the conditions of Plaintiff's workplace.

86. After requesting a reasonable accommodation for his disability and taking time off of work due to his disability, Plaintiff suffered retaliation on Tuesday, March 25, 2025 because of his request for an accommodation and his taking time off of work when his employment was terminated by the Defendant based on a false accusation made against him by Harris, which the Defendant condoned by, among other things, failing to reasonably investigate.

87. The effect of these practices, Plaintiff was deprived of equal employment opportunities and his employment status was adversely affected because of his disability.

88. The unlawful employment practices complained of above were intentional and were done with malice or with reckless indifference to Plaintiff's federally protected rights.

### THIRD CAUSE OF ACTION
**Wrongful Discharge in Violation of North Carolina Public Policy**

89. Plaintiff re-alleges and incorporates by reference each and all of the allegations stated in Paragraphs 1 through 88 of this Complaint as if fully set forth herein.

12

Case 1:25-cv-00282   Document 1   Filed 08/26/25   Page 12 of 15

90. Defendant's termination of Plaintiff's employment because of his disability constitutes discrimination against the Plaintiff violation of the public policy of North Carolina as expressed in N.C.G.S. § 143-422.2, the North Carolina Equal Employment Practices Act.

91. Said statute prohibits the discharge of an employee on account of the employee's handicap, or disability.

92. The effect of Defendant's conduct alleged above has been to deprive the Plaintiff of equal employment opportunities and to otherwise adversely affect his employment status because of his handicap or disability.

93. The Defendant's conduct alleged above has deprived the State of North Carolina of the fullest utilization of its capacity for advancement and development as a civilized society.

94. As a proximate result of Defendant's conduct alleged above, Plaintiff has suffered the following damages:

   a. Past and future pecuniary losses, including, but not limited to, lost pay and benefits, and expenses in seeking other employment; and

   b. Past and future non-pecuniary losses, including, but not limited to, anxiety, emotional suffering, inconvenience, humiliation, and loss of enjoyment of life.

95. Defendant's actions were taken by its managing agents and were malicious, deliberate, and intentional, and demonstrated a willful and wanton disregard for Plaintiff's rights.

96. Plaintiff seeks and is entitled to recover punitive damages from the Defendant under Chapter 1D of the North Carolina General Statutes.

**PRAYER**

WHEREFORE, Plaintiff respectfully prays for the following relief:

1. That this Court enter judgment declaring that Plaintiff's rights under the ADAAA were violated by the Defendant, pursuant to 28 U.S.C. § 2201 – 2202.

2. That the Court order Defendant to make Plaintiff whole for violation of his federally protected rights by providing back pay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices, including front pay.

3. That the Court order Defendant to make Plaintiff whole for violation of his federally protected rights by providing compensation for past and future non-pecuniary losses resulting from Defendant's unlawful employment practices, including anxiety, emotional suffering, inconvenience, humiliation, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

4. That the Court order Defendant to make Plaintiff whole by providing compensation for past and future pecuniary losses resulting from Defendant's wrongful discharge of the Plaintiff in violation of North Carolina public policy, including lost pay and benefits and expenses in seeking other employment, in amounts to be determined at trial.

5. That the Court order Defendant to make Plaintiff whole by providing compensation for past and future non-pecuniary losses resulting from Defendant's wrongful discharge of the Plaintiff in violation of North Carolina public policy, including anxiety, emotional suffering, inconvenience, humiliation, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

6. That the Court order Defendant to pay Plaintiff punitive damages for its malicious, deliberate, intentional, willful and wanton conduct, in an amount to be determined at trial.

7. That the Court award Plaintiff his costs of this action, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988.

8. For a jury trial on all issues so triable.

9. For such other and further relief that the Court deems just and proper.

THIS the 26th day of August, 2025.

                                       s/ Stephen P. Agan
                                       Stephen P. Agan
                                       NC Bar No. 35763
                                       Attorney for Plaintiffs
                                       Hyler & Agan, PLLC
                                       38 Orange Street
                                       Asheville, NC 28801
                                       Phone: (828) 254-1070
                                       E-mail: steve@hylerandagan.com